## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

SHAVIS HOLLOMAN, #1003701

        Petitioner,

v.                                                        Action No.  2:18cv295

HAROLD CLARKE,
*Director for the Virginia Department of Corrections,*

        Respondent.

### UNITED STATES MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

This matter is before the Court on Shavis Holloman's *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, and the motion to dismiss filed by respondent Harold Clarke, Director for the Virginia Department of Corrections ("respondent").  This matter was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia.  For the following reasons, the Court **RECOMMENDS** that respondent's motion to dismiss, ECF No. 9, be **GRANTED**.

### I.      STATEMENT OF THE CASE

The habeas petition in this matter asserts six grounds for relief.  Three of those grounds allege ineffective assistance of counsel arising from the interpretation of, and advice regarding, an immunity agreement.  The other grounds concern the denial of a motion to sever the charges relating to two different victims into different trials, the denial of a motion to strike a member of

the venire for cause, and the admission of a notebook containing information about a criminal street gang.

## A.    Holloman's Trial and Direct Appeals

Shavis Holloman ("Holloman") is an inmate currently housed at Sussex I State Prison, part of the Virginia Department of Corrections. ECF No. 1 at 1. He was convicted by a jury in the Circuit Court of the City of Hampton on July 11, 2014 of first degree murder, attempted robbery, conspiracy, gang participation, malicious wounding, and three counts for the use of a firearm in the commission of a felony. *Commonwealth v. Holloman*, No. CR10-1128-00, -01, -03, -04, -06, -10, -12 (Va. Cir. Ct. Jul. 11, 2014), SCV at 205–06.[1] He was sentenced on the same date to a term of life imprisonment for the murder charge and a total of 63 years of imprisonment for the other charges. SCV at 206–07.

### 1.    Pretrial and Trial Proceedings

On May 16, 2014, Holloman, through his attorney, Nicholas Hobbs ("Hobbs"), filed a motion to dismiss the indictments against him and to specifically enforce an immunity agreement with the Commonwealth that Holloman signed on April 28, 2011, when he was represented by Gregory Blanchard ("Blanchard"). SCV 144–47. The first part of the immunity agreement read:

> The Hampton Commonwealth Attorney's Office agrees not to prosecute you for any violation of the criminal laws of the Commonwealth of Virginia based on statements provided pursuant to this agreement for which truthful disclosure is made and the occurrence of which the Attorney for the Commonwealth has full and

---

[1] "SCV" refers to the paper record in *Holloman v. Commonwealth*, Nos. 151295, 160934 (Va. 2018), received from the Supreme Court of Virginia under cover letter dated August 15, 2018, and consecutively paginated from 1 through 918. There was some confusion in parts of the record regarding whether Holloman was convicted of first or second degree murder; that issue and related matters were raised in Holloman's direct appeals and state habeas proceeding, but the circuit court eventually amended the sentencing order pursuant to Va. Code Ann. § 8.01-428(B) to reflect that Holloman was convicted of first degree murder as a principal in the second degree. SCV 205–06, 869, 871. Because this issue is not presented in Holloman's current petition, it is not further discussed in the factual and procedural background except where needed.

complete knowledge.  This use immunity applies [to] any conversations with the Hampton Police or the Hampton Commonwealth's Attorney's office with respect to knowledge that you have regarding criminal activity.

SCV 148; *Holloman v. Commonwealth*, No. 1319-14-1, (Va. App. 2014) ("Va. App.") at 25.[2]

The immunity agreement further provided that Holloman "must at all times give complete, truthful and accurate information," and that if "it is determined that [Holloman] violated any provision of this agreement, or seek[s] to withdraw from said agreement, all statements made by [him] to this office . . . shall be admissible in evidence in any and all criminal proceedings hereafter brought against [him]."  SCV 148–49.

Holloman argued that the first sentence of this agreement "bar[s] a prosecution in exchange for his statements," and the indictments should be dismissed based on the terms of the agreement drafted by the Commonwealth.  SCV 146.  During a May 22, 2014 hearing on the motion to dismiss, he also argued that the agreement "puts him in a situation where he can't really offer any defense," because if he offered evidence contrary to his statements during his debriefing to police under the immunity agreement, the Commonwealth could present the rest of his statements.  SCV 231.

At the conclusion of the May 22, 2014 hearing, the circuit court ruled that the agreement provided only use immunity, but that the Commonwealth could not admit any of Holloman's statements from his debriefing "under any circumstances."  SCV 225, 237–38.  The Commonwealth asked for a rehearing regarding whether Holloman's statements could be admitted for impeachment purposes.  SCV 241–43.  The court held the re-hearing on June 23, 2014, and denied Holloman's motion to dismiss by order of the same date.  SCV 158.  The court

---

[2] "Va. App." refers to the paper record provided to the Court by the Court of Appeals of Virginia, with pages hand-numbered 1–52 in the bottom right corner.

"determine[d] that this is a use immunity agreement and that the Commonwealth cannot use the Defendant's debriefing statement in [its] case in chief, however, his testimony can be impeached as with any witness." SCV 158.

Holloman also moved for separate trials of his charges related to the August 22, 2010 murder of Thomas "Pete" Needham ("Needham") and the September 17, 2010 shooting of Rhonda Stubbs ("Stubbs"), because there was no common scheme or plan connecting those separate incidents.[3] SCV 152–54. The Commonwealth responded that there was a common scheme and plan because both incidents occurred based on Holloman's leadership of a gang. SCV 258–59. The court denied the motion for separate trials. SCV 158, 259.

The court conducted *voir dire* to impanel a jury on July 9, 2014. SCV 260, 264–361. Venireman James Fronkier ("Fronkier") identified himself as a retired Virginia Army Guard major and a retired Hampton City police detective. SCV 285. As the Commonwealth introduced its potential witnesses, Fronkier acknowledged that he served with Rodney Caison, a Hampton police officer, and knew former Assistant Commonwealth's Attorney David Holt through work. SCV 323–24, 326. When the venire was asked about experiences with violent crime, Fronkier responded that, while in the course of duty, he "was shot and wounded by an assailant who had

---

[3] Holloman had already been indicted, on December 6, 2010, for the charges related to the murder of Needham when he signed the immunity agreement on May 17, 2011. *Commonwealth v. Holloman*, No. CR10-1128-00, -01, -03, -04, -06, -10, -12 (Va. Cir. Ct. Dec. 6, 2010) ("Cir. Ct. R."), pages 26–32. "Cir. Ct. R." refers to volume two of the three-volume paper record provided by the Circuit Court of the City of Hampton, with pages hand-numbered 1–354 in the middle of the bottom of the page. On March 15, 2011, the Assistant Commonwealth's Attorney sent Holloman's counsel a letter with a plea offer, and noted that the Commonwealth "withheld indicting him" on charges related to Stubbs "until this homicide case was resolved." July 21, 2017 Evidentiary Hearing, Pet. Ex. 2. A grand jury indicted Holloman on the charges related to Stubbs on May 20, 2011. Cir. Ct. R. at 36–38. Holloman's "debriefing" with the police and Commonwealth's Attorney's Office occurred on June 1, 2011. July 21, 2017 Evidentiary Hearing Transcript ("Tr.") 15:16, 64:19–65:2.

just murdered [the assailant's] wife and fatally wounded another police officer." SCV 330.  He also acknowledged that his life had been threatened, and that he had been interviewed by police "[a]ny time there's a complaint or an Internal Affairs investigation." SCV 339, 343, 350–51.  The venire was asked if they "ever had a preconceived idea about a person" or "jumped to a conclusion about [] an event" and later "f[ou]nd out that that preconceived idea you had or the conclusion you jumped to turned out to be incorrect?" SCV 352.  Fronkier responded:

> As with all investigations, you have to get past the initial [] meeting and . . . come to understand what . . . the person – regardless of how they come off, forcefully or not [] you get past that, reach a medium point, and – and get to where you can reach an understanding between the two of you, [] past the outer appearances and how they came off.

SCV 355.

Holloman moved to strike Fronkier for cause, arguing that he was a "former Hampton police officer" with "ties" to that department, had "worked closely with a lot of the witnesses in this case," and was a victim of a crime.  SCV 358–59.  The Commonwealth responded that his experience as a police officer did not disqualify him, and he had not shown any bias.  SCV 359.  The court denied the motion, noting there was "no per se disqualification" for former police officers and that it "didn't hear any response that would give [the court] reasonable doubt as to whether he could remain fair and impartial."  SCV 360.

Fronkier was ultimately removed through a peremptory challenge, and was not a member of the jury that decided Holloman's case.  SCV 361, 820–21 (polling jurors for verdict); Va. App. 34; ECF No. 16 at 29.

As summarized by the Court of Appeals of Virginia, the general evidence was as follows:

> At trial, the Commonwealth presented evidence regarding two events, each involving a different victim, Thomas Needham and Rhonda Stubbs.  Witnesses testified that the appellant, known as "S–Dot," was a "five[-]star general" in the

Nine–Trey Bloods criminal street gang.[4]   Prosecution witnesses included Detectives John Baer and Ernest Sales of the City of Hampton Police Department, and Lieutenant R. Whitehead, an assistant watch commander at the Hampton Roads Regional Jail.  The Commonwealth also presented testimony from Essie Hawkins–Whitlock, who was not a member of the gang, as well as Latoya Manning and Stephen Hayes, who were gang members.

The Commonwealth presented evidence that the appellant and some fellow gang members attempted to rob Needham on August 22, 2010.  The appellant drove several of his gang affiliates to Needham's apartment intending to rob him.  Four of his accomplices went to Needham's door while the appellant waited in the car. They decided not to rob Needham at that time, in part because Needham's children were home.  When they returned to the car, the appellant "got upset" and, as the local gang leader, insisted that they complete the robbery.  During the encounter that followed, a fellow gang member, Jamel Carney, shot and killed Needham.

The prosecution also presented evidence that the appellant shot Stubbs on September 17, 2010.  She was leaving a friend's house with her five-year-old son. The appellant was in the same area, once again accompanied by other members of the gang.  While there, the appellant encountered a man with whom he "had a conflict," and the two "exchang[ed] words."  When the man insulted the appellant and intentionally turned away, the appellant opened fire on the street.  Stubbs, an innocent bystander, was shot.  Detective Sales was in the area and saw "the fire coming from the firearms, and [from] the trajectory [he] could see it was coming from where [a] vehicle was located."  Sales immediately stopped the car.  The appellant was a passenger and was later identified as the shooter.[5]

Va. App. 23–24; *Holloman v. Com.*, 775 S.E.2d 434, 438 (Va. App. 2015).

---

[4] For example, Lieutenant R. Whitehead, a watch commander from the Hampton Roads Regional Jail, testified that Holloman signed a "security threat group warning letter" on October 29, 2010, which states that an inmate has "been identified as belonging to a security threat group or having affiliation with members of a security group."  SCV 597, 599–601. He testified that the "security threat group" for Holloman was the Nine Trey set of the Bloods gang.  *Id.* at 599–601; Commonwealth Trial Ex. 14.

[5] Detective Sales testified that he heard shots from two different guns, and that there were five people in the car, including Holloman, when it was stopped by police very shortly after the shots were fired.  SCV 742–44.  He stated that, when the last passenger exited the car (Stephen Hayes), a firearm fell from his lap onto the ground.  *Id.* at 748–49.  Detective Sales testified that Hayes initially told the police that he was the shooter, but during a later police interview, Hayes stated that the guns found in the car belonged to Jevrayal Elliot and Holloman, and forensic testing showed that there was no gunshot residue on Hayes after the shooting of Stubbs.  *Id.* at 761–62. Douglas DeGaetano, a forensic scientist, testified as an expert witness that, after the shooting of Stubbs, gunshot residue was found on the hands of Holloman and Jevrayal Elliot, but not on the other three occupants of the car.  *Id.* at 582–85.

Latoya Manning ("Manning"), one of the individuals involved in the shooting of Needham, testified that she was a member of the Nine Trey gang and that Holloman was the gang's five star general.[6] SCV 399, 400–02, 408. She identified a notebook as the "book of Blood knowledge for Nine Trey" that contained the gang's history and rules that members were expected to remember. *Id.* at 413–14.

Detective John Baer ("Detective Baer") testified that, on October 13, 2010, while he was executing a search warrant in an apartment where Manning and several other individuals involved in the shooting of Needham were found, he recovered the gang notebook identified by Manning.[7] SCV 618–20. Holloman objected to both testimony about the notebook and the admission of the notebook on hearsay and Sixth Amendment Confrontation Clause grounds, because he did not write in or produce the notebook. *Id.* at 623. The court sustained the objection, but ruled the detective could testify to what he found in his investigation. *Id.* at 624–25. Detective Baer stated that the notebook was used to "identify some of the other individuals" in his investigation, including Holloman. *Id.* at 627.

Detective Baer testified that he interviewed Manning and several others in connection with the murder of Needham, and interviewed Holloman on October 15, 2010, while he was in custody. SCV 632–36. He stated that, after the police told Holloman that the other individuals mentioned his involvement in the murder, Holloman initially told them that he drove Manning and the others to Needham's apartment to buy marijuana, but he never left the car. *Id.* at 636–38. Detective Baer stated that, later during that interview, Holloman told them that he was at the bottom of the stairs

---

[6] Detective Sales also testified that "S-Dot," a nickname for Holloman, was listed in a gang notebook as the answer to the questions, "who is your general? [] [W]ho's in charge?" SCV 721.

[7] Detective Baer was promoted to sergeant by the time of the evidentiary hearing in 2017. Tr. 150:9.

to Needham's apartment building when "Deno" (Jamel Carney) shot Needham in the doorway of Needham's apartment. *Id.* at 645–47. He said that Holloman admitted to numerous facts regarding Needham's murder, including: that he drove the group to Needham's apartment and they discussed robbing Needham during the drive; that there was a gun in the car; that he knew they did not rob Needham at first, he went with them on their second trip to Needham's apartment, and someone had a gun that time; and that the people he was "hanging with" that night were in the Nine Trey gang.[8] *Id.* at 689–92.

Detective Ernest Sales ("Detective Sales") was qualified as a gang expert, and testified that the Nine Trey Gangsters are part of the national Blood gang. SCV 694, 699. When Detective Sales was asked to identify the notebook, Holloman objected on the same hearsay and Sixth Amendment grounds. *Id.* at 705–08. The court overruled the objection and allowed Detective Sales to testify about the notebook as the basis for his opinions. *Id.* at 710. He stated that the notebook contained gang history and ideology and a "roll call" of local Nine Trey gang members who were known to the detective. *Id.* at 713–14. Holloman renewed his objections, which the court overruled. *Id.* at 716–18. Detective Sales acknowledged on cross examination that the notebook did not belong to Holloman, was not written in Holloman's handwriting, and it was not found on Holloman's person or in his residence. *Id.* at 780–81. At the conclusion of Detective Sales' testimony, the Commonwealth moved to admit the gang notebook into evidence, and Holloman repeated his earlier objections. *Id.* at 787–88. The court overruled the objections and admitted the notebook into evidence. *Id.* at 789.

---

[8] Detective Sales also testified that Holloman made these admissions during his October 2010 interview with police. SCV 784–85. Neither officer testified about Holloman's statements during the debriefing, and Holloman does not allege that such statements were used at trial in violation of his immunity agreement.

After the Commonwealth rested, Holloman renewed his objections and motions concerning the immunity agreement and the joint trial of his charges; the court upheld its previous rulings on both matters. SCV 805–09. Holloman rested without presenting any evidence.[9] *Id.* at 811. The jury convicted and sentenced Holloman on all charges. *Id.* at 852–54.

### 2.    Holloman's convictions were upheld on direct appeal.

Holloman appealed his conviction to the Court of Appeals of Virginia. ECF No. 1 at 2. He alleged several assignments of error, including, as relevant to the present habeas matter, that the trial court erred by: (1) not dismissing the case after the prosecutor failed to comply with his immunity agreement; (2) trying his charges in a single trial; (3) not striking a member of the venire for cause; and (4) admitting into evidence a gang notebook and related testimony. Va. App. 25; *Holloman*, 775 S.E.2d at 438.

The court of appeals determined that the circuit court did not err by denying Holloman's motion to dismiss the charges against him based on the immunity agreement, concluding that the agreement provided "use" immunity that only granted protection "from the Commonwealth using the specific statements he made in exchange for the agreement," and that the charges were not based on those statements. *Holloman*, 775 S.E.2d at 439.

The court of appeals ruled that the circuit court did not err by denying Holloman's motion for separate trials. *Id.* at 439–42. It determined that the crimes involving Needham and Stubbs were sufficiently connected to justify a joint trial under Rule 3A:6(b) of the Virginia Rules of Criminal Procedure, because they were predicate criminal acts for the gang participation charge under Va. Code Ann. § 18.2-46.2. *Id.* It ruled that justice did not require separate trials, because

---

[9] At the end of the second-to-last day of trial, during an exchange about the schedule on the last day of trial, Holloman's counsel informed the court: "I'm going to talk to my client. We might not have any witnesses." July 10, 2014 Trial Transcript 428:7–8.

Holloman was not unduly prejudiced by the joint trial, considering that evidence of both crimes was admissible for the gang participation charge.[10] *Id.*

The court of appeals also ruled that the circuit court did not abuse its discretion by denying Holloman's request to strike a former Hampton police detective from the venire for cause, although that potential juror was later removed from the jury through a peremptory strike. *Id.* at 442–44. The court noted that, although the potential juror "disclosed that while on duty he had been shot and wounded by a suspect" and "knew two of the people on the Commonwealth's witness list, a law enforcement officer and a former Assistant Commonwealth's Attorney," he also "represented that he had not formed an opinion as to the appellant's guilt or innocence," "did not have a bias in favor of the Commonwealth," and "did not know of any reason why he could not be fair and impartial." *Id.* at 443. The court concluded: "the trial court, which had the ability to see the venireman and hear his responses, concluded that the individual could be impartial. Nothing in this record suggests that the trial court committed manifest error and abused its discretion by declining to strike the juror for cause." *Id.* at 444.

Finally, the court of appeals determined that the admission of the gang notebook and related testimony was harmless error. *Holloman*, 775 S.E.2d at 444–47. It concluded that the gang notebook was hearsay and that no hearsay exception applied to permit its admission, but that the notebook was not "created for the purpose of a criminal investigation or prosecution," and therefore "was not testimonial and its admission, as well as the testimony about it, did not violate the appellant's Sixth Amendment right to confront witnesses against him." *Id.* at 445–46.

---

[10] The court of appeals acknowledged that the circuit court relied on a different argument at trial— that the crimes involving Needham and Stubbs were part of a common scheme or plan—but affirmed the circuit court's decision under the right result for the wrong reason doctrine. Va. App. 29 n.4; *Holloman*, 775 S.E.2d at 440 n.4.

Holloman appealed to the Supreme Court of Virginia, raising the same assignments of error discussed above. Va. App. 48; SCV 882, 892. That court refused his appeal on May 19, 2016. SCV 918; ECF No. 1 at 4. Holloman did not file for a writ of certiorari with the Supreme Court of the United States. ECF No. 1 at 4.

**B.    The Supreme Court of Virginia dismissed Holloman's habeas petition.**

**1.    Holloman's Petition and Initial Proceedings in the Supreme Court of Virginia**

Holloman filed a *pro se* petition for a writ of habeas corpus in the Supreme Court of Virginia on June 20, 2016.[11]   ECF No. 1 at 4; SCV 1.   He raised six grounds in his petition, the first five of which related to ineffective assistance of counsel:   (1) violation of his Sixth and Fourteenth Amendment rights when his initial counsel, Blanchard, failed to investigate and properly inform him of the terms of the immunity agreement; (2) violation of his Sixth and Fourteenth Amendment rights when his trial counsel, Hobbs, failed to investigate the terms of the immunity agreement before trial and instead advised Holloman that he could not be prosecuted on the charges for which he was later convicted; (3) violation of his Sixth and Fourteenth Amendment rights when Hobbs misinterpreted the "employed language" of the immunity agreement and "convinc[ed] Holloman not to accept a plea offer that he wanted to accept"; (4) violation of his Sixth and Fourteenth Amendment rights when Hobbs failed to investigate the statutory guidelines for second degree murder and to object to a life sentence for second degree murder when the statutory maximum was 40 years; (5) violation of his Sixth and Fourteenth Amendment rights when his appellate counsel failed to investigate and raise improper sentencing as an error on direct appeal; and (6) the "trial court errors" he raised on direct appeal. SCV 3–6, 13–14.

---

[11] Holloman's current petition states that he filed a petition with the Supreme Court of Virginia on June 21, 2016, but the record from that court shows that the petition was stamped as filed on June 20, 2016.  SCV 1.

Holloman attached to his petition an affidavit dated October 23, 2015 from his half-brother, Jevrayal Elliot ("Elliot"). SCV 18. Elliot stated that he was willing to testify in Holloman's defense in July 2014, but did not do so after speaking with Hobbs, who told him that defense witnesses would violate Holloman's immunity agreement, which Hobbs said was "guaranteed a win on [] appeal" if the circuit court did not rule that the agreement provided transactional immunity. *Id.* The affidavit did not include any information about Elliot's proposed testimony.

Respondent filed his motion to dismiss on September 6, 2016. SCV 30. He argued that Holloman's claim did not meet either the performance or prejudice prong of ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984), because Holloman did not identify how Blanchard's explanation of the plea agreement was deficient, made no showing of the constitutional rights he waived by signing the agreement, and "cannot establish a reasonable probability of a different result at trial." SCV 36–38. He further noted that Holloman alleged Hobbs was ineffective due to his interpretation of the immunity agreement, but either way the agreement is read, relief was not warranted under *Strickland*, because either Hobbs correctly stood by his interpretation that the agreement provided transactional immunity, or the limited use immunity meant there was no bar to Holloman's prosecution. SCV 39.

Respondent attached as exhibits to his motion to dismiss a notarized letter from Blanchard dated August 18, 2016, and an affidavit from Hobbs dated August 29, 2016, addressing their discussions with Holloman regarding the immunity agreement and refuting Holloman and Elliott's claims about their advice. SCV 60–62.

### 2. The circuit court held an evidentiary hearing regarding the ineffective assistance of counsel claims.

On March 6, 2017, the Supreme Court of Virginia entered an order granting Holloman's motion for an evidentiary hearing regarding certain claims in his petition, including claims (b) and

12

(c).[12]  SCV 858.  As summarized by that court, claims (b) and (c) concerned the factual issue of

"whether, based on counsel's understanding of the petitioner's immunity agreement with the

Commonwealth, counsel advised petitioner to reject a plea agreement." *Id.*

On July 21, 2017, the circuit court held the evidentiary hearing as directed by the Supreme

Court.  July 21, 2017 Evidentiary Hearing Transcript ("Tr.") 1, 4–5.[13]  The court conducted the

evidentiary hearing pursuant to Va. Code Ann. § 8.01-657, which states, in part: "in the event the

allegations of illegality of the petitioner's detention present a case for the determination of

unrecorded matters of fact relating to any previous judicial proceeding, such writ [of habeas

corpus] shall be made returnable before the court in which such judicial proceeding occurred."

SCV 858.  As later explained by the Supreme Court of Virginia when it dismissed Holloman's

petition, the circuit court's factual findings at the evidentiary hearing are binding upon the Supreme

Court of Virginia unless plainly wrong or without evidentiary support.  SCV 876 (citing *Lovitt v.*

*Warden*, 585 S.E.2d 801, 808 (Va. 2003)).

Elliot testified that he was serving a 10-year sentence for charges related to Holloman's

charges, but that he had pled guilty and agreed to testify in another trial in exchange for the

Commonwealth *nol prossing* his murder and home invasion charges.  Tr. 31:18–33:12.  He stated

that Hobbs subpoenaed him as a witness and spoke with him once at the Hampton jail the day

before Holloman's trial, which was after Elliot had accepted his own plea deal.  Tr. 33:13–34:25,

38:2–25.  Elliot testified that Hobbs decided not to call him as a witness at Holloman's trial because

---

[12] The Supreme Court later extended its original deadline for completion of the hearing by granting Holloman's request for an extension of time.  SCV 866.

[13] The transcript is a separately bound and paginated volume produced to this Court under cover letter from the circuit court clerk dated October 29, 2018, as a copy of the transcript was not included in the records sent from the Supreme Court of Virginia.

Hobbs "had another plan. Some type of immunity. . . . his goal basically was he was aiming at an appeal process from my understanding." Tr. 36:2–17.

On cross examination, Elliot stated that his meeting with Hobbs lasted five to ten minutes, and Hobbs "inquir[ed] more about" Elliot's plea agreement as well as "everything about" the testimony Elliot could provide on behalf of Holloman. Tr. 41:4–42:13. He said that Hobbs' reason for not calling him as a witness was that Hobbs "didn't feel comfortable calling me in" as a witness because "something about the terms might violate [] the agreement that was already on the table" for Holloman. Tr. 42:14–43:12. He agreed with his affidavit that Hobbs said "'that if the Court denied the agreement then Mr. Holloman was guaranteed a win on appeal.'" Tr. 48:1–8.

Holloman testified that Blanchard spoke to him about the immunity agreement and suggested that he "should meet with David Holt [from the Commonwealth's attorney's office] and do a debriefing," and Blanchard mailed him the agreement, which he signed. Tr. 64:5–23. He met with Holt and several police officers for a debriefing on June 1, 2011, and said that he agreed to do so because he was "looking to get a plea offer" "so I wouldn't have to spend the rest of my life in prison." Tr. 64:19–66:9. Holloman said that, at the start of the debriefing, Holt was not promising anything, and Holloman told him that he agreed to the "debriefing because I want consideration. I want you to consider giving me a plea offer." Tr. 67:25–68:15.

When asked whether, when he signed the immunity agreement, he believed his charges would be dismissed, Holloman responded: "When I signed the agreement . . . I ain't have an idea for real what was going on . . . . I didn't think I was supposed to not be prosecuted. I thought I always was supposed to be prosecuted, but I was looking for a plea offer." Tr. 70:6–18. He stated that he had Blanchard removed from his case because Holloman "ain't understand the immunity

14

agreement" and Blanchard "was not doing the things that I needed him to do because he didn't explain it to me." Tr. 70:23–71:14.

Holloman testified that Hobbs was then appointed to represent him, and Holloman asked for a jury trial. Tr. 71:17–72:3. He stated that Hobbs visited him in jail on May 16, 2014, and told him that, upon reviewing the immunity agreement more closely, "he realized that the Commonwealth had messed up in the language in the immunity agreement" and "I couldn't be prosecuted at all because they messed up the language." Tr. 72:7–73:7. Holloman was present for the motions hearings when the court determined that the plea agreement did not bar his prosecution. Tr. 73:18–74:18. He had further discussions with Hobbs in June 2014 before trial, and Hobbs informed him that the Commonwealth offered a plea deal with a 20-year prison term. Tr. 74:23–75:6. Holloman stated:

> I asked Mr. Hobbs what did he think about that because Mr. Hobbs was so strongly built on this immunity agreement saying I couldn't be prosecuted. Mr. Hobbs['] exact words to me, he's like, it's one of those issues where if you take 20 years, you will be sitting in the penitentiary and you could have come home in two if you allow this process to work. The process that Mr. Hobbs was talking about was the Supreme Court overruling the [] Judge's ruling about the immunity agreement.

Tr. 75:6–16.

Holloman also explained how his discussions with Hobbs after the motions hearing changed his view of the plea deal:

> Before that point I never thought that I couldn't be prosecuted. So when [Hobbs] came to me and brought [the plea agreement] to me and he explained to me and gave me . . . another copy of the document because I didn't have it, that's when everything started rolling in my head, oh, I can't be prosecuted. The Commonwealth messed up.

Tr. 76:10–18.

Holloman also asserted that Hobbs' motions before and during trial "reflected . . . that he stood 100 percent firm that it was a transactional immunity." Tr. 77:2–11. He only discussed the

20-year plea offer once with Hobbs, although he stated that Hobbs asked the Commonwealth for a plea deal during the trial, which the Commonwealth declined because the case had gone to trial. Tr. 77:12–78:21. Holloman testified that Hobbs "did exactly what he said he was going to do" regarding the actual trial, and agreed that he was "happy with [Hobbs] during [his] trial, the only issue [he had] is the advice about the plea." Tr. 81:6–23.

On cross examination, Holloman acknowledged that the idea for the immunity agreement and debriefing was to "enhance the prospects of the plea agreement the Commonwealth might offer," and that the "debriefing might help [him] such as a plea agreement, but it would not make these charges all go away."[14] Tr. 82:10–83:13, 92:14–25. When asked about Hobbs' assessment of the immunity agreement, Holloman stated that Hobbs "guaranteed success on appeal," and "[i]f Mr. Hobbs would have gave me 1 percent doubt – 1 percent doubt that it was just a legal argument, I would undoubtedly took the Commonwealth plea offer of 20 years. Mr. Hobbs was 100 percent firm and guaranteed that the Supreme Court will overturn this and I will be home in two years." Tr. 93:9–94:9.

Holloman rested, and the Commonwealth presented its evidence. Blanchard testified that the appellate court's view of the immunity agreement was consistent with his own understanding. Tr. 117:5–16. He stated that Holloman "understood that these charges would go forward," and he did not "perceive any misunderstanding from Mr. Holloman as to the limited nature of this immunity agreement." Tr. 118:2–12. Blanchard stated that Holloman "indicated to me he wanted

---

[14] During the Commonwealth's case, Sergeant John Baer testified that he was present during the debriefing, and he prepared a report of the debriefing stating that "Mr. Holt, the prosecutor, advised Holloman that everything he talks about in this interview cannot be used against him in court unless he does not tell the truth. There's a prearranged understanding" between the Commonwealth and defense counsel. Tr. 154:5–17. He further stated: "Holloman was asked what he expected to get out of all this. Holloman said that he just wanted some time. . . . he did not want to spend the rest of his life in prison." Tr. 154:21–155:13.

to try the case if . . . the offer wasn't acceptable," meaning within a "15 year range" for his sentence. Tr. 123:6–19. He said that Holloman wrote him a letter on the day he signed the immunity agreement asking Blanchard to "express to the Commonwealth with the best of your ability where in this case a smaller sentence should be recommended well into 15 years." Tr. 129:20–30:4. He stated that another letter from Holloman while in jail a year later, on May 31, 2012, contained similar requests for a plea agreement. Tr. 132:2–24. Specifically, Holloman asked for a sentence less than or equal to the one given to Elliot, stated that the "most I'm willing to take is 12 years," and requested Blanchard to prepare for trial "if no satisfying plea agreement can be made."[15] Tr. 132:2–33:19.

David Holt ("Holt"), the prosecutor at the time of Holloman's immunity agreement, testified that he made a plea offer for 30 years at some point "in the course of [his] dealing" with Holloman, but Holloman rejected it, "telling [Holt] that it was a life sentence for him, that 30 years was too long." Tr. 159:20–160:20.

Artisha Gregg ("Gregg"), the trial prosecutor, testified that she took over the case in 2013, at which point Hobbs had already replaced Blanchard as Holloman's counsel. Tr. 190:2–7, 191:14–25. She said that, several months before trial in 2014, she offered Holloman a verbal 20-year plea deal, which was the lowest jail term that her boss would authorize, but Holloman wanted 15 years or less. Tr. 192:7–94:23. She said that, at the time she offered Holloman a 20-year plea deal, his debriefing was not being considered in his plea offer because he was no longer cooperating, and she did not know whether the information he previously provided led to any other

---

[15] It appears that Holloman was held in jail during the years before his trial. *See, e.g.*, Tr. 131–32 (discussing the May 2012 letter from Holloman while he was in jail), Tr. 137 (noting Holloman was in jail when he signed the immunity agreement in 2011); *see also* Cir. Ct. R. at 8 (October 18, 2010 order for Holloman to be held without bail following his arrest) and Cir. Ct. R. at 130 (April 1, 2011 order denying bail).

individuals pleading guilty. Tr. 197:1–6. She acknowledged that Hobbs argued up through the trial that the immunity agreement provided transactional immunity. Tr. 200:1–11.

Hobbs testified that he more closely examined the immunity agreement after Gregg told him that she might be able to use Holloman's statements from the debriefing even if he did not testify at trial, which changed from the prior prosecutor's understanding that he would not use Holloman's debriefing unless Holloman testified and "said something inconsistent." Tr. 202:4–03:10, 206:5–25. He stated that he then thought the immunity agreement was ambiguous and "looked like it was offering blanket immunity." Tr. 207:1–21. He spoke with Holloman before filing his motion to dismiss, and said the "gist" of that discussion was "we were making a legal argument that because it's an ambiguity . . . there might be a benefit on him that should be honored by the Commonwealth since the Commonwealth drafted this agreement." Tr. 209:4–17. Hobbs stated: "I don't think I ever went in [to Holloman] and said 100 percent this is . . . your ticket out of here. It was more, I feel this is a good argument." Tr. 210:6–12. When the circuit court denied his motion, he explained the appellate procedure to Holloman and told him "[i]f the trial went disfavorably to him, he had grounds [to appeal] at that point." Tr. 212:3–14. Hobbs denied that he ever told Holloman not to accept a plea offer because he was entitled to blanket immunity or because the Supreme Court would reverse his conviction within two years. Tr. 216:24–17:16.

Hobbs described meeting with Gregg and the Commonwealth's Attorney to negotiate a plea offer that Holloman would accept, but the Commonwealth could not go below a 20-year sentence, and Holloman rejected the plea offers for 20- and 25-year sentences because he said it "might as well be the same as a life sentence." Tr. 217:17–218:25, 221:22–222:21. He said that, if the offer was 20 years or more, Holloman was "willing to take the risk at trial . . . I think he said

going down with a fight."[16]  Tr. 224:4–10. Hobbs stated that "if I thought the whole reason why he was turning down a plea agreement was because he knew he was going to win on appeal, I would have cautioned him a little bit on that." Tr. 224:16–25:1. He also stated that he "prepped for this trial very hard" because he "wanted Mr. Holloman to have a fair trial all the way through." Tr. 226:5–18.

Hobbs acknowledged that he subpoenaed Elliot and had him transported to the Hampton jail in case he needed to call him as a witness at trial. Tr. 227:1–9, 228:20–22. He did not recall speaking with Elliot, but said that he "was leery of using [Elliot] as a witness to begin with" because of his statements to police that were detrimental to Holloman, and said that he "can't imagine I would ever say anything like" Holloman was "guaranteed a win on his appeal" as asserted in Elliot's affidavit. Tr. 227:10–229:5. On cross examination, he stated that, when he discussed the immunity agreement with Holloman, "I don't think we were under the assumption" that the Commonwealth originally agreed to transactional immunity, but "[w]e were arguing that there was an ambiguity. And, therefore, you could read it to be that way." Tr. 252:15–253:8. Hobbs said that he "did tell [Holloman] I thought it was a good issue," "[b]ut I wouldn't have told him, yeah, don't take this plea offer because you're golden on this because . . . that's just crazy." Tr. 253:10–16.

Hobbs stated during his direct examination that Elliot's claim that his testimony would ruin Holloman's appeal "doesn't make any sense to me at all" because it "had absolutely nothing to

---

[16] A May 31, 2012 letter from Holloman to Blanchard was admitted into evidence at the hearing in which Holloman made a similar statement: "Also if no satisfying plea agreement can be made with the new Commonwealth attorney on my case then I'm requesting for you to start preparing for trial because if I got to spend my life in prison for something I didn't do, then Ima do it fighting!" Commonwealth Hrg. Ex. 2, p. 2. As noted above, in the same letter Holloman wrote that he wanted a plea offer "for the total of 10 [years] or less (the most I'm willing to take is 12 yrs!)." *Id.*

do" with a potential appeal. Tr. 227:25–228:4, 229:7–19. He added, on cross examination, that

he was not concerned that Elliot's statements would violate the truthfulness requirement of

Holloman's immunity agreement, because he already argued about the immunity agreement and

that issue was preserved for appeal, and the agreement did not have any bearing on his decision

whether to call Elliot. Tr. 237:3–19. He noted that the Commonwealth never asserted that

Holloman "didn't honor [the immunity agreement] because he was untruthful." Tr. 240:9–19.

The circuit court issued its report of the evidentiary hearing on September 15, 2017.

Regarding the immunity agreement,

> the court found that counsel[17] understood that petitioner's agreement with the
> Commonwealth was use immunity. Counsel did not advise petitioner to reject a
> plea agreement offered by the Commonwealth. Counsel testified that he advised
> petitioner that acceptance or rejection of the plea agreement was solely petitioner's
> decision. ... This court further found that counsel did not advise petitioner that he
> guaranteed success on appeal of the trial court's denial of transaction immunity.
> Counsel never promised petitioner success on appeal.

SCV 867–68.

Holloman filed objections to the circuit court's findings with the Supreme Court of Virginia

on October 19, 2017. SCV 871. He asserted that Hobbs did not concede that the plea agreement

---

[17] The circuit court's report does not clearly identify which "counsel"—Blanchard or Hobbs—is
discussed here, SCV 867–68, and the Supreme Court of Virginia's order regarding the evidentiary
hearing also does not name the "counsel" involved in the habeas grounds referenced as claims (b)
and (c). SCV 858. However, it appears from Holloman's habeas petition to the Supreme Court
of Virginia that claims (b) and (c) relate to Hobbs, whereas claim (a), which relates to Blanchard,
was not ordered to be part of the evidentiary hearing. SCV 3–5, 867–68. These findings of the
circuit court appear to relate more directly to Hobbs' conduct, and the report did not include any
additional findings specifically related to Blanchard. The lack of specific findings related to
Blanchard is consistent with the circuit court's decision to treat Blanchard as merely a witness who
was not present in the courtroom throughout the proceedings, because there was not an ineffective
assistance claim against him as the court understood the Supreme Court of Virginia's order. Tr.
13–18. In contrast, Hobbs was allowed to remain in the courtroom at the counsel table because
claims (b) and (c) that were the subject of the hearing alleged he provided ineffective assistance of
counsel. Tr. 10–12, 15–18.

offered "use immunity" rather than transactional immunity, that he was not able to fully question Hobbs regarding plea discussions, and that the court did not consider his testimony when it concluded that counsel did not advise him about guaranteed success on appeal based on the immunity agreement. *Id.* at 871–74.

### 3.   The supreme court dismissed the habeas petition.

The Supreme Court of Virginia dismissed the habeas petition on March 6, 2018. ECF No. 1 at 5; SCV 876. Holloman's claim (a) alleged that Blanchard provided ineffective assistance of counsel by failing to explain the immunity agreement before Holloman signed it and purportedly waived the right to testify in his own defense. SCV 3–4. The court concluded that claim (a) "satisfies neither the 'performance' nor the 'prejudice' prong of the two-part test enunciated in *Strickland.*" SCV 877. The court summarized the evidence and the history of the plea negotiations as found by the circuit court, including the following:

> In April 2011, following petitioner's indictment, the Commonwealth presented petitioner's counsel, Gregory Blanchard, with a "use immunity" agreement, which extended immunity to statements "provided pursuant to this agreement." Under the terms of the immunity agreement, petitioner was required to "truthfully disclose" to the Commonwealth information regarding petitioner's knowledge of the crimes. The immunity agreement also provided if petitioner violated the agreement "all statements" made by petitioner to the Commonwealth "shall be admissible in evidence in any and all criminal proceedings." Petitioner and his counsel signed the agreement.
>
> . . . .
>
> On June 1, 2011, pursuant to the immunity agreement, petitioner met with the Commonwealth for a "debriefing" and provided a detailed account of the events at issue. Petitioner testified at the evidentiary hearing he entered in the agreement and met with the Commonwealth because he was "looking for a plea offer" from the Commonwealth.   Petitioner also testified he understood he would still be prosecuted, even after discussing his knowledge of the crimes with the Commonwealth.
>
> . . . .

Accordingly, petitioner entered into the immunity agreement in hopes of obtaining a plea agreement to avoid a life sentence, understood he would still be prosecuted for his role in the crimes after the debriefing, and was informed in writing and verbally any untruthful statements would be used against petitioner in future court proceedings. Petitioner did not waive his right to testify in his own defense by entering into the immunity agreement and was informed any future contradictory statements made about the crimes could allow statements made during the debriefing to be used against petitioner. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

SCV 877–78.

The court then analyzed Holloman's claims (b) and (c), in which he "contends he was denied effective assistance of counsel because counsel [Hobbs] misunderstood the effect of the immunity agreement and, as a result, advised petitioner to reject a favorable plea agreement." SCV 3, 878. The court found that these claims also failed to satisfy either prong under *Strickland*, noting:

The record, including the trial transcript, the transcript of the July 21, 2017 evidentiary hearing, and the circuit court's findings of facts, demonstrates that, prior to trial, the court appointed new counsel, Nicholas Hobbs, for petitioner and removed Blanchard from the case, pursuant to petitioner's request. Petitioner's new counsel filed a motion to dismiss the indictments, arguing the immunity agreement was ambiguous and provided petitioner with "blanket immunity." Hobbs testified at the evidentiary hearing that he understood the agreement intended to provide use immunity, but he believed a portion of the agreement was ambiguous. Upon researching the issue, Hobbs informed petitioner he could advance a "good" argument the agreement should be construed against the Commonwealth, the drafter of the agreement. Hobbs testified he did not tell petitioner he was certain the motion would be successful or otherwise guarantee petitioner would prevail in obtaining transactional immunity.

. . . .

Following denial of the motion, Hobbs testified he explained to petitioner the process for appealing the decision. Hobbs testified he did not make any representations to petitioner that the trial court's denial of the motion to dismiss the indictments would be reversed on appeal or that petitioner should reject a plea offer from the Commonwealth because petitioner would prevail on appeal and that petitioner did not tell him to reject a plea because petitioner believed he would

prevail on appeal. Hobbs testified he presented the Commonwealth's plea offers to petitioner and petitioner told him to reject the offers because [] he was willing to take the risk of trial because petitioner believed the sentences offered by the Commonwealth were the equivalent of a life sentence. Hobbs testified he did not recall meeting with Elliot prior to trial, but decided not to call Elliot as a witness because Elliot's prior statements about the crimes were detrimental to petitioner's case.

The circuit court rejected petitioner's evidence that counsel advised petitioner to reject a plea agreement offered by the Commonwealth because petitioner was guaranteed to prevail in obtaining transactional immunity on appeal. This Court is bound by the circuit court's findings as they are not plainly wrong or without evidentiary support. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

SCV 879–80.

Finally, the Supreme Court noted that Holloman advanced several other unnumbered claims, alleging that the trial court erred by: denying his motion to dismiss under the terms of the immunity agreement; denying his motion for separate trials; denying his motion to strike a venire member for cause; and "admitting a 'gang notebook' and related expert testimony because such evidence violated the rule against hearsay and his right to confront witnesses against him under the Sixth Amendment." SCV 880–81. It held these claims were "barred because the issues were raised and decided in the circuit court and on direct appeal from the criminal conviction, and therefore, they cannot be raised in a habeas corpus petition." SCV 881.

## C.    Holloman's Habeas Corpus Proceedings in this Court

Holloman timely placed the pending federal petition for a writ of habeas corpus in the prison mailing system on April 3, 2018.[18] ECF No. 1 at 20. He presents six grounds for relief, summarized as follows:

---

[18] The one-year statute of limitations to file a federal habeas petition was tolled during the review of his habeas petition filed with the Supreme Court of Virginia from June 20, 2016 through the dismissal of his petition on March 3, 2018. *See* 28 U.S.C. § 2244(d)(1)(A), (d)(2).

(1) Hobbs was ineffective due to his failure to investigate the terms of an immunity agreement from the Commonwealth before advising Holloman regarding the same;

(2) Hobbs was ineffective because he misinterpreted the terms of the "use immunity" agreement as a "transactional immunity" agreement and so advised Holloman not to accept a plea deal to serve 20 years in prison because Hobbs believed the immunity agreement meant he could not be prosecuted;

(3) the trial court violated Holloman's constitutional rights by not separating the trials of his charges arising from unrelated incidents involving Needham and Stubbs;

(4) the trial court violated Holloman's constitutional rights by denying his motion to strike, for cause, a retired Hampton police officer from the venire;

(5) the trial court violated Holloman's constitutional rights by overruling his Sixth Amendment and hearsay objections and admitting into evidence a "gang notebook" and testimony that Holloman was a general in the Nine Trey Gang; and

(6) Blanchard violated Holloman's Sixth and Fourteenth Amendment rights by failing to investigate and inform Holloman of the terms of an immunity agreement, and Holloman's acceptance of that agreement waived his right to testify.

*Id.* at 5–16.

He asserts that his "not guilty plea was entered involuntarily and unintelligently because it was induced by gross misinformation of his counsel concerning his offer of 'transactional immunity.'" *Id.* at 19.

On August 1, 2018, respondent filed an answer to the petition pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts and a motion to dismiss the petition, along with a supporting memorandum.[19] ECF Nos. 9–11. On August 10, 2018, after receiving an extension of time, Holloman filed a response to the motion to dismiss. ECF Nos. 14, 16. On October 5, 2018, the Court granted Holloman's motion to amend his response by attaching his affidavit thereto. ECF Nos. 17–18.

---

[19] The motion to dismiss included a separately filed notice, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), and Local Rule 7(K), providing Holloman with notice of how to timely respond thereto and the potential consequences for failing to do so. ECF No. 12.

## II.    ANALYSIS

### A.    Standard of Review

Preliminarily, the Court must confirm that Holloman exhausted his remedies in state court before addressing the merits of the habeas petition, *see* 28 U.S.C. § 2254(b), and that the claims were not procedurally defaulted in state court. *See Fisher v. Angelone*, 163 F.3d 835, 844 (4th Cir. 1998). The exhaustion doctrine ensures that state courts have a meaningful opportunity to consider allegations of constitutional violations before presentation of such claims to a federal court. *Rose v. Lundy*, 455 U.S. 509, 515 (1982). The exhaustion requirement is satisfied when the "essential legal theories and factual allegations advanced in federal court [are] the same as those advanced at least once to the highest state court." *Pruett v. Thompson*, 771 F. Supp. 1428, 1436 (E.D. Va. 1991). Exhaustion may be achieved either through direct appeal or in post-conviction proceedings. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999) (citing *Brown v. Allen*, 344 U.S. 443, 447 (1953)).

Because Holloman raised the grounds presented in the current habeas petition to the Supreme Court of Virginia in his direct appeal and habeas petition to that court, the exhaustion requirement is satisfied here. The procedural default doctrine does not apply here, because the state habeas court did not base its dismissal of the habeas petition on a state procedural rule. *See Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998).

When a claim has been properly exhausted and adjudicated on the merits in state court, this Court assesses the state court adjudication pursuant to 28 U.S.C. § 2254(d), rather than reviewing the merits of such a claim *de novo*. Section 2254(d) provides that a federal court may not grant relief on any claim that was adjudicated on its merits in state court, unless that adjudication:

25

    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

A state court decision is "contrary to" clearly established federal law when a state court applies a rule different from the governing law articulated by the Supreme Court of the United States or arrives at a conclusion opposite that of the Supreme Court on materially indistinguishable facts. *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citation omitted); *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). A state court decision constitutes an "unreasonable application" of federal law when the court identifies the correct governing legal principle from the decisions of the Supreme Court, but unreasonably applies that principle to the facts of the case. *Williams*, 529 U.S. at 413; *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that an unreasonable "application of clearly established law must be objectively unreasonable," rather than simply "incorrect or erroneous"). Stated differently, a "prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

"For a state court's factual determination to be unreasonable under [section] 2254(d)(2), it must be more than merely incorrect or erroneous. It must be sufficiently against the weight of the evidence that it is objectively unreasonable." *Winston v. Kelly*, 592 F.3d 535, 554 (4th Cir. 2010) (citations omitted). Pursuant to this deferential standard of review, "state-court judgments must be upheld unless, after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated." *Williams*, 529 U.S. at 389.

**B.**     **Holloman has not shown in grounds 1, 2, and 6 that the Supreme Court of Virginia's determination regarding the effectiveness of his counsel was contrary to, or unreasonably applied, clearly established federal law or was based upon an unreasonable factual determination.**

Three of Holloman's grounds for habeas relief allege ineffective assistance of counsel based on advice regarding his immunity agreement. First, ground six alleges that Holloman's Sixth and Fourteenth Amendment rights were violated because Blanchard failed to investigate and properly inform Holloman of the terms of the immunity agreement and the constitutional rights he would waive by signing the agreement, including that Holloman would not be able to testify in his own defense. ECF No. 1 at 16. Ground one asserts that Holloman was denied effective assistance of counsel under the Sixth and Fourteenth Amendments because Hobbs failed to investigate the terms of his immunity agreement before advising Holloman. *Id*. at 5–6. Finally, ground two similarly asserts that Holloman was denied his Sixth and Fourteenth Amendment rights because Hobbs misinterpreted the immunity agreement to provide "transactional" rather than "use" immunity, and, based on that incorrect understanding, advised Holloman to reject a plea offer with a 20-year prison term. *Id*. at 7–8.

As a threshold matter, the three grounds of the petition based on ineffective assistance of counsel are all based on the Supreme Court's 1984 *Strickland* decision, so they depend on a rule of law that was clearly established at the time of Holloman's state court conviction in 2014. *See Williams*, 529 U.S. at 390 ("The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final. That question is easily answered because the merits of his claim are squarely governed by our holding in *Strickland*.").

To review a claim of ineffective assistance of counsel, the Court must apply "a doubly deferential standard of review that gives both the state court and the defense attorney the benefit

of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013) (quotation marks omitted). The applicable standard in *Strickland* requires a petitioner to show that his defense counsel provided assistance that (1) fell below an objective standard of reasonableness, and (2) prejudiced petitioner as a result. *Strickland*, 466 U.S. at 687–96.

To establish that counsel's performance fell below an objective standard of reasonableness, petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. In doing so, petitioner must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689).

To establish prejudice, petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. This requires petitioner to establish "probability sufficient to undermine confidence in the outcome," rather than a mere showing that "the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693–94. A federal habeas court need not address both performance and prejudice if the defendant makes an insufficient showing on either one. *Id.* at 697.

Because petitioner presents these claims in a petition for federal habeas review under section 2254, he must show that the state court's dismissal of his ineffective assistance of counsel claims was contrary to, or an unreasonable application of, the *Strickland* standard, or was predicated upon an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).

Addressing ground six, the Supreme Court of Virginia determined that Blanchard's representation regarding the immunity agreement did not satisfy either prong of the test in *Strickland*. SCV 877. It concluded that Holloman "entered into the immunity agreement in hopes of obtaining a plea agreement to avoid a life sentence, [and] understood he would still be prosecuted for his role in the crimes after the debriefing," and that Holloman "did not waive his right to testify in his own defense by entering into the immunity agreement and was informed any future contradictory statements made about the crimes could allow statements made during the debriefing to be used against" him. SCV 878.

The Supreme Court of Virginia properly identified and reasonably applied the *Strickland* standard to ground six. Holloman has not demonstrated that Blanchard's performance fell below an objective standard of reasonableness. As noted by the Supreme Court, and supported by the record of the evidentiary hearing, Blanchard presented the immunity agreement to Holloman because he believed Holloman's cooperation "could facilitate the negotiation of a plea agreement," Holloman participated in the debriefing because he was "looking for a plea offer," and Holloman understood that he would still be prosecuted even after the debriefing.[20]   SCV 877–78. Furthermore, the immunity agreement did not preclude Holloman from testifying in his own defense, much less prevent him from mounting any defense at all; it simply allowed the Commonwealth to use his statements if he was untruthful. Holloman's arguments regarding Blanchard's performance and advice regarding the immunity agreement do not overcome the

---

[20] Holloman's contention that the Commonwealth would offer him transactional immunity and no jail sentence after charging him with numerous violent crimes, including murder, defies common sense and experience. Holloman's current interpretation is also at odds with his own understanding at the time he signed the immunity agreement and inconsistent with the fact that he was jailed both before and after the immunity agreement and debriefing.

"'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch*, 273 F.3d at 588.

Nor has Holloman demonstrated that Blanchard's performance was prejudicial such that there is a reasonable probability that the outcome would have been different. As noted above, Holloman was not prejudiced by the immunity agreement because the agreement did not preclude him from testifying in his own defense.[21] There is also not a reasonable probability that the outcome would have been different if Blanchard had advised him differently regarding the immunity agreement, because the record is clear that, even after Holloman provided information in his debriefing pursuant to the immunity agreement, the Commonwealth was not willing to make a plea offer with a prison sentence short enough to meet Holloman's demands and obviate the trial.[22]

The Supreme Court of Virginia also determined that Hobbs' representation regarding the immunity agreement did not satisfy either prong of the test in *Strickland*, so Holloman's grounds one and two did not support habeas relief. SCV 879. It noted that the "circuit court rejected [Holloman's] evidence that [Hobbs] advised [him] to reject a plea" offer because Holloman was guaranteed success on appeal by arguing for transactional immunity, and concluded that it was

---

[21] Although not specifically addressed in prior proceedings, there are a variety of reasons Holloman may have chosen not to testify that are independent of the immunity agreement and any concern about the use of his statements during the debriefing, such as, for example, his post-arrest admissions to the police about his involvement in the Needham murder, his signature on the "security threat group" letter regarding gang affiliation, and his four prior felony convictions for distribution of cocaine, conspiracy, violation of the Drug Control Act of Virginia, and evading and eluding the police. SCV 689–92, 784–85; July 11, 2014 Trial Transcript 121–24; Commonwealth Trial Ex. 14, 21–24.

[22] As noted above, Holloman's May 2012 letter to his counsel stated that he wanted a plea offer "for the total of 10 [years] or less (the most I'm willing to take is 12 yrs!)," Commonwealth Hrg. Ex. 2, p. 2, and Hobbs confirmed that Holloman rejected plea offers for 20- and 25-year prison terms because they were not short enough. Tr. 218:1–25, 222:2–21.

bound to accept the circuit court's factual findings as not plainly wrong or without evidentiary support. SCV 880.

The Supreme Court of Virginia properly identified and reasonably applied the *Strickland* standard to grounds one and two. Holloman has not demonstrated that Hobbs' performance fell below an objective standard of reasonableness. As noted by the Supreme Court, and supported by the record of the evidentiary hearing, Hobbs argued before and during the trial that the immunity agreement provided transactional immunity, and he explained to Holloman that he thought it was a "good" argument and a ground for appeal, but did not guarantee success on appeal or advise against accepting a plea offer based on his interpretation of the immunity agreement. Although Hobbs advanced an argument that the agreement provided transactional immunity and precluded prosecution, he also prepared for trial, and Holloman acknowledged that he was satisfied with his performance at trial. Hobbs adopted a reasonably prudent, multi-faceted strategy that included (1) using the alleged ambiguity in the immunity agreement to try to secure the dismissal of the charges, and (2) when the court did not dismiss the charges, defending Holloman at trial while preserving for appeal his arguments about the immunity agreement.[23] Hobbs' strategy to argue his interpretation of the agreement and mount a defense at trial are not outside the realm of an objectively reasonable attorney's actions.

Holloman's evidence focused on factual issues regarding Hobbs' advice, asserting that Hobbs advised him to reject plea offers based on his interpretation of the immunity agreement.

---

[23] Presumably, Hobbs' arguments about the nature of the immunity agreement also created some uncertainty for the Commonwealth about proceeding with the prosecution, which may have been part of Hobbs' strategy to encourage a more favorable plea offer from the Commonwealth. In fact, Gregg testified that the Commonwealth reduced its plea offer from 25 years to 20 years "several months" before the July 2014 trial, which was roughly contemporaneous with Hobbs filing the motion to dismiss based on the immunity agreement on May 16, 2014. Tr. 192:11–193:13; SCV 144, 147.

Holloman and Elliot testified to this effect. As the Supreme Court of Virginia noted, the circuit court, which saw their live testimony, rejected their accounts. SCV 880. Thus, the Supreme Court of Virginia did not make an unreasonable determination of the facts when it concluded that Holloman did not overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch*, 273 F.3d at 588 (quoting *Strickland*, 466 U.S. at 689). Holloman has not met his burden to rebut with clear and convincing evidence the presumption that the factual determinations made by the state courts are correct. *See* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

Holloman also failed to demonstrate that Hobbs' performance was prejudicial such that there is a reasonable probability that the outcome would have been different. As noted above, Holloman was not prejudiced by the immunity agreement because the agreement did not preclude him from testifying in his own defense, and different advice about the immunity agreement would not have led Holloman to accept the Commonwealth's plea offers. There were effectively two options on which Hobbs could have advised Holloman. The first option was to advise Holloman that the agreement provided complete immunity, in which case Holloman would not accept a plea deal with prison time because he would believe that he could not be prosecuted at all. The second option was to advise Holloman that the agreement only provided use immunity in exchange for Holloman providing information to the Commonwealth in an attempt to secure a favorable plea deal. This second option is essentially what occurred, and such advice did not lead to a plea deal

because Holloman rejected the Commonwealth's plea offers proposing prison sentences of 20 years or more.

Thus, the advice Holloman claims he should have received would not have changed the outcome. Instead, the record shows that Holloman understood that the immunity agreement did not bar his prosecution, and that he was not willing to accept the sorts of prison sentences that the Commonwealth offered, because he viewed them as equivalent to life sentences and preferred to go down fighting rather than accept those terms.

Accordingly, regarding grounds one, two, and six, the Supreme Court of Virginia did not apply *Strickland* contrary to settled law, and it did not make an unreasonable determination of the facts in applying the *Strickland* standard to the record in this case.

**C.     Holloman has not established in ground three that the appellate court's decision upholding the denial of his motion for separate trials was contrary to, or an unreasonable application of, clearly established federal law.**

Ground three of Holloman's petition argues that his "constitutional rights" were violated when the circuit court denied his motion for separate trials on the charges relating to the death of Needham and the shooting of Stubbs. ECF No. 1 at 10. The Court of Appeals of Virginia upheld the circuit court under the right result for the wrong reason doctrine, concluding that the crimes involving Needham and Stubbs were sufficiently connected to justify a joint trial under Rule 3A:6(b) of the Virginia Rules of Criminal Procedure. That court determined that the two crimes were predicate criminal acts for the gang participation charge and Holloman was not unduly prejudiced by the joint trial, considering that evidence of both crimes was admissible for that charge. *Holloman*, 775 S.E.2d at 439–42.

This Court examines the last reasoned decision addressing ground three. *Grueninger v. Dir., Va. Dep't of Corrections*, 813 F.3d 517, 525 (4th Cir. 2016) (citing *Ylst v. Nunnemaker*, 501

U.S. 797, 803 (1991) (federal habeas courts should presume that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground")).  In this case, the Virginia Court of Appeals was the last court to provide reasons addressing the motion for separate trials, because the Supreme Court of Virginia refused Holloman's direct appeal, and noted when ruling on his habeas petition that this issue was raised and decided on direct appeal.  SCV 880–81.

The Court of Appeals of Virginia relied on Rule 3A:6(b) of the Virginia Rules of Criminal Procedure to determine that the circuit court did not err by denying the motion for separate trials on the charges related to Needham and Stubbs.[24]  *Holloman*, 775 S.E.2d at 439–42.  Habeas relief in the federal courts is available to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The Supreme Court has repeatedly held that "'federal habeas corpus relief does not lie for errors of state law.'"  *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting *Estelle v. McGuire,* 502 U.S. 62, 67 (1991) (additional citation and quotation marks omitted)).  Accordingly, to the extent that ground three of Holloman's petition challenges a decision based on Virginia's procedural rules, it is not cognizable in a habeas proceeding before this Court.

---

[24] Rule 3A:6(b) provides: "Two or more offenses, any of which may be a felony or misdemeanor, may be charged in separate counts of an indictment or information if the offenses are based on the same act or transaction, or on two or more acts or transactions that are connected or constitute parts of a common scheme or plan."  Rule 3A:10(c) then provides for a defendant to be tried on multiple charges at once: "The court may direct that an accused be tried at one time for all offenses then pending against him, if justice does not require separate trials and (i) the offenses meet the requirements of Rule 3A:6(b) or (ii) the accused and the Commonwealth's attorney consent thereto."  The trial court has discretion to join or sever charges for trial.  *See Walker v. Commonwealth*, 770 S.E.2d 197, 199 (Va. 2015) (reviewing decision to join charges for abuse of discretion).

Assuming that ground three presents a cognizable claim under 28 U.S.C. § 2254, it is most appropriately considered a challenge under section 2254(d)(1), because Holloman effectively argues that the state court's ruling was "contrary to, or involved an unreasonable application of, clearly established Federal law" regarding joint trials. *See* 28 U.S.C. § 2254(d)(1).

As an initial matter, it is unclear that there is a clearly established federal law with respect to severance of claims in a criminal trial. *See, e.g.*, *Hernandez v. Commonwealth*, 234 F. Supp. 3d 316, 326 (D. Mass. 2017). For example, Rule 8 of the Federal Rules of Criminal Procedure states that an "indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Rule 13 provides for a joint trial "if all offenses and all defendants could have been joined in a single indictment or information," and Rule 14 allows the court to "order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires" "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government." Fed. R. Crim. P. 13, 14(a). The Supreme Court has observed that the joinder rules in the Federal Rules of Criminal Procedure "are not themselves of constitutional magnitude," and that "[i]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986).

The Fourth Circuit has similarly observed that improper joinder is reviewed as a nonconstitutional error, and that an "error involving misjoinder 'affects substantial rights and requires reversal *only* if the misjoinder results in actual prejudice because it had substantial and

injurious effect or influence in determining the jury's verdict.'" *United States v. Hawkins*, 776 F.3d 200, 206, 209 (4th Cir. 2015) (quoting *Lane*, 474 U.S. at 449) (additional citation and quotation marks omitted)).

> In assessing whether a misjoinder error results in actual prejudice, we are guided by the *Lane* Court's indicia of harmlessness:
>
> (1) whether the evidence of guilt was overwhelming and the concomitant effect of any improperly admitted evidence on the jury's verdict; (2) the steps taken to mitigate the effects of the error; and (3) the extent to which the improperly admitted evidence as to the misjoined counts would have been admissible at trial on the other counts.

*Id.* at 209–10 (citations and quotation marks omitted).

Thus, even assuming that *Lane* clearly established a federal law regarding joinder of claims in a single state trial, the ruling of the Court of Appeals of Virginia was not contrary to, or an unreasonable application of, that clearly established federal law under 28 U.S.C. § 2254(d)(1). Although it did not directly address the "actual prejudice" factors from *Hawkins*, the appellate court determined that the evidence of Holloman's gang participation was "overwhelming," the improper admission of the gang notebook was harmless and had "no substantial influence on the verdicts," and Holloman was "not unduly prejudiced by allowing the Commonwealth to try the charges [relating to Needham and Stubbs] together, because evidence of both incidents was admissible to prove an element of the gang participation charge—that the Nine-Trey Bloods was a criminal street gang under [Va.] Code [Ann.] §§ 18.2-46.1 and -46.2(A)." *Holloman*, 775 S.E.2d at 442, 447. Although not discussed by the Court of Appeals, the circuit court also took steps to mitigate the effects of jointly trying the charges arising from different victims on different dates, such as instructing the jury on the particular evidence and elements for the crimes relating to Needham and Stubbs, and specifying that the Commonwealth had to prove every element of an offense beyond a reasonable doubt. July 11, 2014 Trial Transcript 34:25–35:7, 38:5–46:22.

The ruling of the Court of Appeals was therefore not contrary to, or an unreasonable application of, established federal law regarding the joinder of claims in a single criminal trial. Ground three of Holloman's petition fails to state a basis for federal habeas relief under 28 U.S.C. § 2254.

**D.**     **Holloman has not established in ground four that the appellate court's decision upholding the denial of his motion to strike Fronkier was contrary to, or an unreasonable application of, clearly established federal law.**

In ground four of the petition, Holloman argues that his "constitutional rights" were violated when the circuit court denied his motion to strike veniremen Fronkier due to his connections to the Hampton police department that raised reasonable doubts about his impartiality. ECF No. 1 at 12. The Court of Appeals of Virginia was the last court to render a reasoned opinion on this issue. *See Grueninger*, 813 F.3d at 525. It concluded that the circuit court did not abuse its discretion by denying the motion to strike Fronkier. *Holloman*, 775 S.E.2d at 444. It noted that the circuit court concluded that Fronkier could be impartial, that he had not formed an opinion regarding Holloman's guilt or innocence, he gave no indication of bias toward the Commonwealth, and he assured the court that he could hear the case fairly. *Id.*

Ground four alleges a violation of Holloman's constitutional rights for failure to strike a potentially partial veniremen. Although not specifically identified in the petition, ground four appears to assert a violation of the Sixth Amendment, which provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ." U.S. Const. amend. VI. The Court of Appeals of Virginia did not address the Sixth Amendment in its decision upholding the denial of Holloman's motion to strike Fronkier for cause, but it concluded that the circuit court

did not abuse its discretion when it determined that Fronkier could serve as an impartial juror. *Holloman*, 775 S.E.2d at 443–44.

Because Fronkier was ultimately excused from the jury through a peremptory strike and did not serve as a juror, ground four turns on the clearly established federal law regarding the exercise of peremptory strikes to achieve an impartial jury. The Supreme Court has explained:

> [W]e reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury. We have long recognized that peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.

*Ross v. Oklahoma*, 487 U.S. 81, 88 (1988) (citations omitted).

In *Ross*, the defendant in a capital case moved to strike a member of the venire for cause, because the venireman stated that he would vote to impose the death penalty automatically if the defendant was found guilty. *Id*. at 83–84. The trial court denied the motion to strike, but the defendant later exercised a peremptory strike to remove the venireman, and the defendant did not challenge for cause any of the twelve jurors who ultimately decided the case. *Id*. at 84.

The Supreme Court affirmed the defendant's conviction, noting that the defendant "was undoubtedly required to exercise a peremptory challenge to cure the trial court's error," but "no violation of [defendant's] right to an impartial jury occurred" when he did so. *Id*. at 88. The Supreme Court also rejected the defendant's Fourteenth Amendment argument that the state court deprived him of due process by arbitrarily depriving him of the full number of peremptory challenges provided by state law. *Id*. at 89. It noted: "Because peremptory challenges are a creature of statute and are not required by the Constitution, it is for the State to determine the number of peremptory challenges allowed . . . As such, the 'right' to peremptory challenges is 'denied or impaired' only if the defendant does not receive that which state law provides." *Id*.

38

(citations omitted). The Supreme Court concluded that, "[a]lthough the trial court erred in failing to dismiss [the] prospective juror [] for cause, the error did not deprive petitioner of an impartial jury or of any interest provided by the State." *Id.* at 91.

The Supreme Court later applied *Ross* to a federal case, and concluded that "if the defendant elects to cure such an error [of refusing to dismiss a potential juror for cause] by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based or constitutional right." *United States v. Martinez-Salazar*, 528 U.S. 304, 307 (2000) (concluding that no Fifth Amendment violation occurred when the defendant used a peremptory strike to remove a juror who should have been stricken for cause).

Accordingly, because Holloman has not alleged that the jury impaneled to decide his case was not impartial or that his right to exercise peremptory strikes was denied or impaired because he was not provided the strikes to which state law entitled him, he has not alleged a violation of his constitutional rights to due process and an impartial jury under the Fifth, Sixth, or Fourteenth Amendments. The decisions of the Court of Appeals of Virginia and Supreme Court of Virginia were not contrary to, or an unreasonable application of, clearly established federal law regarding a defendant's right to an impartial jury. Thus, Holloman's ground four does not establish a ground for habeas relief under 28 U.S.C. § 2254(d)(1).

Nor does Holloman's ground four establish a basis for habeas relief under 28 U.S.C. § 2254(d)(2). Holloman has not rebutted the presumption that the state court's factual determinations were correct. However, even if the circuit court made an "unreasonable determination of the facts" regarding Fronkier's ability to serve as an impartial juror, Fronkier was

not seated as a juror, and Holloman received a trial by an impartial jury as required by the Constitution.

Accordingly, Holloman has not established in ground four that he is entitled to habeas relief under 28 U.S.C. § 2254.

**E.     Holloman has not established in ground five that the appellate court's decision upholding the admission of the gang notebook was contrary to, or an unreasonable application of, clearly established federal law.**

Ground five of Holloman's petition asserts that his constitutional rights were violated when the circuit court overruled his hearsay and Sixth Amendment objections and admitted the gang notebook and related testimony into evidence. ECF No. 1 at 14. The Court of Appeals of Virginia, the last court to render a reasoned opinion on this issue, concluded that the circuit court erred by admitting the gang notebook because it was hearsay, but found the admission of the notebook and related testimony was harmless because of the other overwhelming evidence to support the gang participation charge.[25] *Holloman*, 775 S.E.2d at 445, 447. The appellate court also determined that the admission of the notebook did not violate Holloman's Sixth Amendment right to confront witnesses because the notebook was not testimonial, because it was used by the gang and was not "created for the purpose of a criminal investigation or prosecution." *Id*. at 446.

Part of the allegation in ground five is that the gang notebook was improperly admitted because it was hearsay, which is determined by Virginia law and rules of evidence. As noted above, "'federal habeas corpus relief does not lie for errors of state law.'" *Wilson*, 562 U.S. at 5 (quoting *Estelle,* 502 U.S. at 67 (additional citation and quotation marks omitted)); *see also, e.g.*, *Hayes v. York*, 311 F.3d 321, 324–25 (4th Cir. 2002) (noting that, in a habeas proceeding, the

---

[25] The Supreme Court of Virginia did not address the merits of this issue during Holloman's habeas proceeding, because it had been decided on direct appeal by the Court of Appeals of Virginia. SCV 881.

question of whether a state court erred by admitting evidence under a given hearsay exception "is unreviewable in federal court as it solely concerns state law, over which this court has no authority"). Accordingly, to the extent that ground five of Holloman's petition challenges a decision based on Virginia's evidentiary rules and the appellate court's harmless error analysis, it is not cognizable in a habeas proceeding before this Court.

The other allegation in ground five is that the admission of the notebook violated the Confrontation Clause of the Sixth Amendment, which provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend VI. Thus, "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law," but "[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68 (2004). *Crawford*, however, did not define the requirements for defining "testimonial" hearsay evidence. *Id.* at 68.

Later cases focused on the purpose of the hearsay evidence to determine whether it was testimonial. *See, e.g.*, *Michigan v. Bryant*, 562 U.S. 344, 377–78 (2011) (concluding that a fatal shooting victim's statements to police identifying the shooter, made while the victim was bleeding in a parking lot, were not testimonial hearsay "[b]ecause the circumstances of the encounter as well as the statements and actions of [the victim] and the police objectively indicate that the 'primary purpose of the interrogation' was 'to enable police assistance to meet an ongoing emergency'"). The Supreme Court, summarizing its precedents, observed that "a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial." *Ohio v. Clark*, 135 S. Ct. 2173, 2180 (2015). This "primary purpose test" must consider "all of the relevant

circumstances," such as the formality or informality of the situation and interrogation, and "[i]n the end, the question is whether, in light of all the circumstances, viewed objectively, the primary purpose of the conversation was to creat[e] an out-of-court substitute for trial testimony." *Id.* (citations and quotation marks omitted).

Under this standard, for example, the Supreme Court concluded that a child's statements to his preschool teachers identifying a defendant as his abuser were not testimonial, because they "were not made with the primary purpose of creating evidence for [] prosecution," but instead the "statements occurred in the context of an ongoing emergency involving suspected child abuse." *Id.* at 2181. The Court noted that statements made to persons who are not law enforcement officials could not be categorically excluded from the Sixth Amendment, but that "such statements are much less likely to be testimonial than statements to law enforcement officers." *Id.* It further noted, in commenting on the fact that the child victim made a statement to his teachers, that the "questioner's identity" was an important factor in evaluating the context of the statements, and that "[s]tatements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." *Id.* at 2182.

The Court of Appeals for the Fourth Circuit has also concluded that records or reports created "for the administration of [a] regularly-conducted business" were not testimonial. *United States v. Keita*, 742 F.3d 184, 190 (4th Cir. 2014) (concluding that it was not plain error to admit internal credit card company documents that daily identified compromised accounts in a credit fraud case). As the court noted, "'[b]usiness and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of

42

establishing or proving some fact at trial—they are not testimonial.'" *Id.* (quoting *Melendez–Diaz v. Massachusetts,* 557 U.S. 305, 324 (2009)).

 Given recent Supreme Court precedent explaining that statements are not testimonial, and thus not governed by the Sixth Amendment, when their primary purpose is not to create an out-of-court substitute for trial testimony, the decision of the Court of Appeals of Virginia was not contrary to, or an unreasonable application of, clearly established federal law. As the appellate court noted when ruling that the gang notebook was not testimonial, the notebook was used by gang members for gang purposes, and there was no "reason to believe that the notebook was created for the purpose of a criminal investigation or prosecution." *Holloman*, 775 S.E.2d at 446. Quite the opposite; the notebook was apparently made and used by a group of people attempting to cover up and prevent the prosecution of criminal behavior, which suggests that the statements therein are "significantly less likely to be testimonial." *Clark*, 135 S. Ct. at 2182. Additionally, insofar as the notebook contained information about the gang's hierarchy and code of conduct, it is comparable to the type of business records properly admitted in *Keita*, because it was "created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial." *Keita*, 742 F.3d at 190 (citation and quotation marks omitted).

 Accordingly, Holloman has not established a violation of his constitutional rights under the Sixth Amendment. The decision of the Court of Appeals of Virginia was not contrary to, or an unreasonable application of, clearly established federal law regarding a defendant's rights under the Confrontation Clause. Thus, Holloman's ground five does not establish a ground for habeas relief under 28 U.S.C. § 2254(d)(1).

### III.    RECOMMENDATION

For the foregoing reasons, the Court **RECOMMENDS** that respondent's motion to dismiss, ECF No. 9, be **GRANTED**, and the petition for a writ of habeas corpus, ECF No. 1, be **DENIED**.

### IV.    REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.    Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.    A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

Robert J. Krask
United States Magistrate Judge
Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
January ___, 2019

44